UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH NANAS,

      Plaintiff,

v.                                                                           Hon. Victoria A. Roberts
                                                                         Case No. 04-71660

SCHOOLHOUSE SERVICES
& STAFFING, INC., a Michigan
corporation,

      Defendant.
_____

**<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**I.    INTRODUCTION**

This matter is before the Court on Defendant's Motion for summary judgment. For the following reasons, the Court **GRANTS** Defendant's motion.

**II.    BACKGROUND**

This case arises out of the Plaintiff, Elizabeth Nanas' employment with the Defendant, Schoolhouse Services & Staffing, Inc. ("Schoolhouse"). Schoolhouse is a private company that manages and staffs charter schools. In this case, Central Michigan University ("CMU") and Oakland University were designated by state statute to issue a charter to a Board of Directors for each charter school. The Board then hired Schoolhouse to manage the day to day operations of the school.

The Plaintiff was employed by Schoolhouse. She was hired in February 1997 as

a student services coordinator and promoted to project director in August 1998.  The Plaintiff worked primarily at the Detroit School of Industrial Arts ("DSIA"), which was chartered by CMU, she also worked with Dove Academy and Weston Technical Academy.  The Plaintiff's duties included collecting data, writing reports, writing grant proposals, and writing reports pertaining to the allocation of grant money.  C. Tyla Wells ("Wells") is the founder of Schoolhouse and Susan Diehl ("Diehl") is the vice president of operations.

      The Plaintiff worked closely with Diehl.  She claims that on many occasions she requested financial information from Diehl for use in the budget portion of grant requests but was denied the information.  Allegedly, Diehl filled in the information herself or would give the information to the Plaintiff at "the last minute."  In the fall of 2002, the Plaintiff claims she was required to state on a report that Schoolhouse paid two full-time employees to run a program.  The Plaintiff was only aware of two half-time employees.  She questioned Diehl regarding the discrepancy and received a "negative reaction."  The Plaintiff also claims a report stated three full-time people worked in a different program, but she was only aware of one half-time and two full-time employees.    In the spring of 2003, the Plaintiff saw a letter from CMU addressed to the president of the DSIA Board questioning Schoolhouse's management fees.  The Plaintiff believed Schoolhouse's response falsely implied that some of the fee went towards maintaining a corporate office; Schoolhouse is run out of the home of Wells and Diehl.  Lastly, the Plaintiff felt Schoolhouse did not report major problems in providing services to special needs students.  The Plaintiff claims Diehl did not respond to her questions regarding this issue.

In May of 2003, Plaintiff anonymously contacted CMU to voice her concerns about potential fraud and the services available to special needs students. After this, Diehl became more hostile when Plaintiff requested financial information, according to Plaintiff. Diehl allegedly yelled at the Plaintiff and told her she did not know what she was doing. The Plaintiff contends Diehl threatened to put someone else in her job. However, the Plaintiff admits she did not reveal her identity as the complainant to CMU until after Diehl's outbursts became increasingly severe.

In January 2004, the Plaintiff searched for budget figures on her own from the Michigan Department of Education after she got budget figures from Diehl that she believed were inaccurate. On January 26, 2004, Diehl found out and scheduled a meeting with the Plaintiff to discuss their "different understandings of Plaintiff's job responsibilities." That evening, the Plaintiff sent an email to Diehl and Wells listing the suspected fraud claims, the problems with the special needs services and her duty to report them to a government entity. Following the email, Wells cancelled Plaintiff's meeting with Diehl and investigated Plaintiff's claims. Plaintiff told Wells everything she knew about the suspected violations. Wells instructed Plaintiff to concentrate on the investigation and not to perform her usual work functions. Wells also instructed Diehl not to have contact with Plaintiff during the investigation.

The next day, Wells sent an email to Plaintiff requesting a meeting and inquiring into her job duties and hours. The Plaintiff felt the investigation was focused on her and she allegedly suffered anxiety. Plaintiff claims Wells was hostile to her and changed her schedule to one she knew the Plaintiff could not work.

Schoolhouse claims Wells requested that Plaintiff be available full-time to assist

3

in the investigation. Schoolhouse also asserts that the reason the Plaintiff could not work is because she covertly held a position with Wayne State University. Plaintiff does not dispute those allegations.

On February 1, 2004, Plaintiff sent a letter of resignation to the DSIA Board, effective February 2, 2004. She also included the allegations of fraud and poor services. She sent copies of the letter to two individuals a CMU, including the director of charter schools.

On May 3, 2004, Plaintiff filed a two count complaint against Schoolhouse. The Plaintiff alleges she was constructively discharged in violation of 42 USC §1983 and the Michigan Whistleblower's Protection Act, MCL §15.361 *et. seq.* The constructive discharge, she says, was in retaliation for exercising her First Amendment rights when she informed others about the suspected fraud and inadequate services for special needs students.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989).  The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

**IV.  APPLICABLE LAW AND ANALYSIS**

    **A.  42 USC §1983 Claim**

The Plaintiff alleges Defendant constructively discharged her through the hostile treatment from Wells and Diehl and the change in her work schedule, after she expressed her concerns of potential fraud and poor services for special needs students.

"A claim may be brought under §1983 only if the defendant acted 'under color' of state law." The parties dispute whether Schoolhouse is a state actor. The Plaintiff claims it is, because it manages a charter school that is defined as a public school by statute. Schoolhouse argues it is a private contractor. For purposes of this motion, the Court assumes without deciding that Schoolhouse acted under color of state law pursuant to §1983.

"To establish a prima facie case of First Amendment retaliation under 42 USC §1983, [plaintiff] must demonstrate that: (1) [s]he was engaged in a constitutionally protected activity; (2) [s]he was subjected to adverse action or deprived of some benefit; and (3) the protected speech was a substantial or motivating factor in the adverse action." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). A state does have some control over the speech of its employees, but they are not forced to sacrifice their First Amendment free speech rights. *Id.* There is a three step inquiry to determine if an employer has violated the First Amendment by firing a public employee for engaging in speech: (1) a court must ascertain whether the relevant speech addressed a matter of public concern; (2) the court must balance the interests of the public employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees; and (3) the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse

6

employment action against the employee. *Id.* (citation omitted).

### 1. The Plaintiff was engaged in constitutionally protected activity.

Indisputably, the Plaintiff was engaged in constitutionally protected activity when she divulged her suspicions of fraud involving grant money and poor services for special needs students. "Speech of a public employee is entitled to First Amendment protection if it relates to a matter of public concern." *Leary v. Daeschner*, 349 F.3d 888, 899 (6th Cir. 2003). "A public employee's speech that relates to any matter of political, social, or other concern to the community at large is properly considered speech on a matter of public concern." *Id.* (*citing Connick v. Myers*, 461 U.S. 138, 146 (1983)).

### 2. The Plaintiff failed to demonstrate she was subjected to an adverse action or deprived of a benefit.

The Plaintiff claims that she was constructively discharged as a result of the hostile comments from Wells and Diehl[1]. The Plaintiff does not allege any other adverse action, such as a demotion, reduction in pay, etc. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003)(citation omitted). Working conditions must be so difficult or unpleasant that a reasonable person would have felt compelled to resign. *Id.* Courts look at all of the

---

[1] The Plaintiff also claims her work schedule was changed, but Schoolhouse argues it was changed for two days so that the Plaintiff would be available to assist in the investigation. The Plaintiff does not dispute this. This action by Schoolhouse was reasonable under the circumstances and there is no allegation by the Plaintiff that it was done with the intent to force her to resign.

circumstances in determining if an environment would be hostile or abusive to a reasonable person. *Id*. "Such circumstances include, the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id*. The employer's intent must also be examined; the employer must have intended that the plaintiff quit. *Id*. at 636.

Plaintiff fails to establish a genuine issue of fact regarding whether a reasonable person, confronted with this situation, would have quit. Nor has she established a question of fact on whether Wells or Diehl intended that she quit when they made hostile remarks. Plaintiff's only allegations are that Wells was "hostile" to her and changed her schedule to one which she knew Plaintiff could not work. [Plaintiff's Response, p. 6]. However, Plaintiff offers no details as to the severity or frequency of Wells' hostility, and Schoolhouse claims the schedule change was to ask the Plaintiff to work an eight hour day while the investigation was going on so that she would be available to assist. Plaintiff does not dispute Schoolhouse's reason for the schedule change.

Also, Plaintiff alleges Diehl was hostile and on one occasion, she yelled at Plaintiff, saying she did not know what Plaintiff was doing and Diehl threatened to put someone else in Plaintiff's position. [Plaintiff's Response, p. 3-4]. Again, Plaintiff does not provide any details to demonstrate the circumstances were difficult or unpleasant enough that a reasonable person would have felt compelled to resign. Plaintiff makes no showing that Schoolhouse intended to force her to quit. Therefore, Plaintiff fails to support her claim under §1983 and Schoolhouse is entitled to summary judgment.

### B. Whistleblower Claim - MCL §15.361

Plaintiff also fails to state a claim under Michigan's Whistleblower Protection Act ("WPA"). "In order to establish a claim of an unlawful discharge under the WPA, plaintiff [is] required to show that (1) [s]he was engaged in protected activity as defined by the act, (2) the defendant discharged [her], and (3) a causal connection exists between the protected activity and the discharge." *Trepanier v. National Amusements, Inc.*, 250 Mich.App. 578, 583 (Mich.App. 2002)(citation omitted). "A person is engaged in 'protected activity' under the WPA where the person (1) reports a violation or suspected violation of a law or regulation to a public body, (2) is about to report such a violation to a public body, or (3) is asked by a public body to participate in an investigation." *Id*.

As discussed above, Plaintiff failed to establish she was discharged. Similar to the federal definition of constructive discharge, under Michigan law, "constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion v. Nationwide Security, Inc.*, 450 Mich. 702, 710 (1996). Because Plaintiff failed to allege any details sufficient to raise a genuine issue of fact on whether Schoolhouse's conduct was so severe that a reasonable person would feel compelled to resign, Schoolhouse is entitled to summary judgment.

### V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

**S/Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**

**Dated: December 23, 2005**

**The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 23, 2005.**

**s/Carol A. Pinegar**
**Deputy Clerk**